Judge Jamal N. Whitehead

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL YOUNG,<br><br>Defendant. | NO. CR24-164-JNW-06<br><br>UNITED STATES' SENTENCING MEMORANDUM |

Defendant MICHAEL YOUNG appears before this court for sentencing in the above-captioned case pursuant to his guilty plea, entered on July 7, 2025, to a lesser-included offense of that charged in Count 1 of the indictment, Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). (Presentence Report (PSR) at ¶ 2; Plea Agreement at ¶ 1.). The United States objects to Probation's recent changes to the Presentencing Report that removed the leadership enhancement and added "dated criminal history" as a rational for a departure from the advisory guideline system. Defendant's "dated" criminal history washed and thus wasn't included in the sentencing guidelines. Thus, it is only a potential basis for an upward departure but not a downward departure. And the admitted facts in the plea statement outline a clear basis for a leadership enhancement for Mr. Young who played a significant organizer/managerial role for an unidentified partner drug organization

United States' Sentencing Memorandum - 1
United States v. Young, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

responsible for transporting large quantities of fentanyl pills. Young has multiple prior drug trafficking related convictions and played a leadership role in distributing over 170,000 fentanyl pills. Thus, probation and defense' recommendation to sentence Defendant to the mandatory minimum is unjustified. This Court should sentence defendant at the low-end of the standard guideline range, which the Government calculates as 168 months.

## I. BACKGROUND

### A. Offense Conduct

#### 1. Summary of investigation

Starting in early 2022, the Federal Bureau of Investigation, the Drug Enforcement Administration, and other federal and local law enforcement agencies began an investigation into a multi-state drug trafficking organization led by the Marquis Jackson ("the Jackson DTO"). (PSR ¶ 36.) Through this investigation, investigators learned that the Jackson DTO was distributing large amounts of controlled substances, primarily fentanyl, throughout the country. (PSR ¶ 37.) The Jackson DTO conducted their criminal activities in multiple states including Washington, Arizona, Kansas, Missouri, Texas, and Georgia. (PSR ¶ 37.) Before serving arrest warrants in this case, agents had seized approximately 825,900 fentanyl pills, 6.5 kilograms of fentanyl powder 7.69 kilograms of cocaine, 3.3 kilograms of methamphetamine, 8 firearms, and $93,205 in United States currency believed to be the proceeds of drug trafficking. (PSR ¶ 37) The Jackson DTO transported these drugs using various means including couriers who would drop off "ghost bags" at the airport, shipping drugs in protein containers, and transporting drugs using hollowed-out vehicle tires. (PSR ¶ 39).

#### 2. Young's Role in the Criminal Conspiracy

Michael Young worked in partnership with Mandel Jackson, one of the central leaders of the Jackson DTO. (PSR ¶ 43). Young's role in the conspiracy dates back to at least May 25, 2024, when agents identified a FedEx package sent by Young containing

United States' Sentencing Memorandum - 2
United States v. Young, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  70,000 fentanyl pills hidden in a protein container. (PSR ¶ 45). Later, pursuant to a lawful
2  Title III intercept order, agents intercepted numerous calls between Young and Mandel as
3  they discussed large scale deals to purchase fentanyl pills and conspired to set up an
4  interstate distribution network for marijuana. (PSR ¶ 46). These calls establish that both
5  Young and Mandel served as high-ranking members of the conspiracy. (PSR ¶ 46).
6        In these calls, Young frequently referred to another network of drug suppliers that
7  obtain fentanyl pills on his behalf. On August 6, 2024, Young and Mandel compare
8  pricing on their various fentanyl suppliers. (Plea Agreement ¶ 7(d)). Young told Mandel,
9  "*My people* are paying 34 or 32 in Ohio" referring to paying 32 to 34 cents per pill for
10  fentanyl. *Id.* Young then agreed to pool his money with Mandel to make a large purchase
11  of fentanyl pills for a lower price. *Id.* Young's reference to "My people" combined with
12  his ability to make decisions on going in on a large purchase of fentanyl pills with
13  Mandel demonstrates that Young played, at minimum, an organizer role if not a
14  leadership role for the unidentified and unindicted Ohio wing of this criminal conspiracy.
15        In a subsequent intercepted call on August 9, 2024, Young discusses how he is the
16  only person his organization's supplier will trust to make a large purchase of controlled
17  substances. In the intercepted call, Young tells Mandel ".33. Yeah, 33. 33 for 100.
18  (referring to purchasing 100,000 fentanyl pills at 33 cents per pill) I'm about to go 'wang'
19  them over the head with this bread. (Plea Agreement ¶ 7(f)). The bread's already down
20  there. I just, they ain't gonna leave nobody but me for that." This call demonstrates a few
21  things demonstrating Young's leadership role: (1) he knows all the details of his
22  organization's large drug purchase, (2) he has someone else transport the money on his
23  behalf ("the bread's already down there"), and (3) that the supplier will only trust him to
24  make such a large purchase ("they ain't gonna leave nobody but me for that.")
25        After the Jackson DTO lost their supplier (Edgar Valdez, who was arrested in this
26  case), Young agreed to supply Mandel with fentanyl pills. On September 2, 2024, Young
27  told Mandel that he had 20,000 fentanyl pills that he could sell at 70 cents per pill. (Plea

United States' Sentencing Memorandum - 3
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Agreement ¶ 7(i)). Thus, Young played a co-equal partnership role to Mandel Jackson, one of the central leaders of the Jackson DTO.

**B.    Procedural History**

On September 25, 2024, the Grand Jury indicted Young on one count of Conspiracy to Distribute Controlled Substances (Count 1). (Dkt. 1). Young was arrested and made his initial appearance on October 2, 2024. (Dkt. 39). On April 23, 2025, the Grand Jury returned a second superseding indictment, which did not change the charges as related to Michael Young. (Dkt. 386). On July 7, 2025, Young pleaded guilty to a lesser-included count of conspiracy as charged in Count 1, in violation of 18 U.S.C. § 841(b)(1)(B). (Dkt. 557).

## II.    BACKGROUND ON SENTENCING

Under 18 U.S.C. § 3553(a), the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). There are four sentencing purposes set forth in Section 3553(a)(2): (1) just punishment or retribution ("to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"); (2) deterrence ("to afford adequate deterrence to criminal conduct"); (3) incapacitation ("to protect the public from further crimes of the defendant"); and (4) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). *See Rita v. United States*, 551 U.S. 338, 348 (2007) (using these four terms); *see also Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

In determining a sentence that complies with these four sentencing purposes, a sentencing court must consider the "nature and circumstances of the offense and the history and characteristics of the defendant," the "kinds of sentences available," the Sentencing Guidelines range and Sentencing Commission's relevant policy statements, the "need to provide restitution to any victims of the offense," and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been

United States' Sentencing Memorandum - 4
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

found guilty of similar conduct." 18 U.S.C. § 3553(a)(1), (3)-(7). When considering these factors, the Sentencing Guidelines range "should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. Any deviation must be reasonable, and a "major departure" from the Guidelines range "should be supported by a more significant justification than a minor one." *Id.* at 50. Here, neither defendant's request nor Probation's recommendation for a mandatory minimum sentence of five years can be justified considering Young's unscored prior drug trafficking convictions, his leadership role in the unidentified Ohio branch of the Jackson DTO, his involvement in the distribution of at least 170,000 fentanyl pills, and his close ties to DTO leader Mandel Jackson. The government believes a sentence at the low end of the sentencing range is sufficient, but no greater than necessary to accomplish the 3553 sentencing factors.

### III. SENTENCING GUIDELINES CALCULATIONS

**A. Offense Level**

**1. The Base Offense Level**

Young was responsible for buying and distributing massive quantities of fentanyl pills. The parties stipulated to a base offense level of 36 (under USSG § 2D1.1(c)(2) based on only the drug deals identified in the intercepted calls and seized through the male. (Plea Agreement ¶ 8(a))[1]

**2. Leadership Enhancement:**

Under USSG § 3B1.1(c), this Court should apply a two-level enhancement because Young served as an organizer in the criminal activity. In determining whether a leadership enhancement applies, the Court can consider a variety of factors including (1) the exercise of decision-making authority, (2) the nature of participation, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature

---

[1] The plea agreement mistakenly refers to relevant conduct involving at least 90,000 kilograms of converted drug weight, but the parties agree that the converted drug weight involved between 30,000 and 90,000 kilograms of converted drug weight. (PSR ¶ 51.)

United States' Sentencing Memorandum - 5
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

and scope of the illegal activity, and (7) the degree of control and authority exercised over others. (USSG § 3B1.1(c) application note 4.)

None of the cases cited by defense support the proposition that a leadership enhancement would not apply in this case. In *United States v. Beltran*, the 9th Circuit upheld a leadership enhancement from a defendant who hid heroin on a child that was present during the drug transaction. 165 F.3d 1266 (9th Cir. 1999). In *United States v. Kabir*, the 9th Circuit upheld a leadership enhancement for a defendant whose recruitment efforts to al-Qaida were indicative of playing a leadership role. 51 F.4th 820 (9th Cir. 2022). The Court found that though a defendant "must have exercised control over others," a "defendant need only have 'some control' over his subordinate's actions, which includes organizational responsibility." *Id.* at 826. Lastly, the Court only rejected the leadership enhancement in *US v. Pimentel-Lopez* because there was insufficient corroboration to the co-conspirator's hearsay statement that the defendant directed others to rent the stash house. 859 F.3d 1134 (9th Cir. 2017). The facts of *Pimentel-Lopez* are inapposite to the present case where the facts surrounding defendant's leadership role are stipulated to in the plea agreement and were identified in title III intercepted phone calls.

Contrary to Defendant's claims, the leadership enhancement need not be proven by direct evidence of a specific order to a subordinate but can be established through circumstantial evidence. Here, the calls establish that Young had clear decision making authority to negotiate prices and set up deals on behalf of his branch of the DTO. Additionally, he recruited other members of the conspiracy as demonstrated by the call where he attempted to recruit Mandell to join him in the interstate transportation and sale of marijuana and that he had recruited a barber in Oklahoma to sell weed on their behalf. The calls demonstrate that Young had authority over others in the conspiracy as he told Mandel that the money for a 100,000 pill deal was already "down there" indicating that he had sent someone else to transport the money on his behalf. The same call indicates that he alone had control over the DTO's relationship with their main supplier as no one else could be trusted to purchase the 100,000 fentanyl pills from the supplier. Thus, the

United States' Sentencing Memorandum - 6
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

context of these calls establish that Young played a leadership role in the conspiracy that warrants a two-level enhancement under USSG § 3B1.1(c).

### III. Acceptance of Responsibility

The government moves the Court to apply a three-level reduction because the defendant has demonstrated acceptance of responsibility for the offense under USSG 3E1.1(a) and (b). (PSR ¶¶ 49; Plea Agreement ¶ 9.) With this adjustment, the Government calculates Young's total offense level as 35 in comparison to probation and defense' calculation of 33. (PSR ¶¶ 51-60.)

### B. Defendant's Criminal History:

Defendant has multiple prior drug trafficking felony convictions. Each of these convictions are too old to count for purposes of scoring. Thus, the Government agrees with probation's calculation of the Defendant's Criminal History Category of I.

### C. Guidelines Range

Based on his total offense level of 35 and criminal history category I, Young's guideline sentencing range for Count 1 is 168 to 210 months. (USSG Chapter 5, Part A (Sentencing Table.))

### II. FACTORS RELATED TO SENTENCING RECOMMENDATION

The United States respectfully requests that the Court sentence the defendant to the low end of the sentencing guidelines (168 months) followed by a four-year term of supervised release. The United States believes this sentence is appropriate in light of "the nature and circumstances of the offense," and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(C). A review of pertinent Section 3553(a) sentencing factors, below, supports a low-end guidelines sentence of 168 months.

### A. Nature, Circumstances, and Seriousness of the Offense

Young was a trusted member of a large distribution network responsible for

United States' Sentencing Memorandum - 7
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

distributing hundreds of thousands of fentanyl pills. Young worked directly with Mandel Jackson, one of the key leaders of the Jackson DTO, to compare prices, purchase and sell fentanyl to one another, and to conspire to go in together on large fentanyl deals. Intercepted calls indicate that Young had an unidentified network of drug traffickers that he organized. Even when limiting Young's involvement to the calls specifically identified in the Title III intercepts, Young is responsible for distributing at least 170,000 fentanyl pills, a particularly dangerous drug that has had a devastating impact on the community. Users of fentanyl frequently resort to stealing—from family members, friends, and complete strangers—to feed their addictions. No doubt, drug users are responsible for a large percentage of these crimes, as well as the violent crimes, in our communities.

More importantly, these drugs destroy the lives of those who use them, and the lives of the users' families and friends. Those families and friends are prisoners, forced to watch the toll these drugs take on their sons, daughters, parents, or friends. While the number of people directly and indirectly impacted by the drugs Young and his co-conspirators trafficked is difficult to quantify, it is undeniably extensive based on the intercepted communications indicating this DTO was responsible for transporting hundreds of thousands of fentanyl pills on a regular basis and the massive quantities of drugs that agents seized during this investigation. If agents had not intercepted these drugs, they would have undoubtedly fell into the hands of long-time addicts, first-time users, and everyone in between. And when dealing in quantities involving tens of thousands of pills, they would have unquestionably led to overdose and death.

Especially with respect to first-time users of fentanyl, who are sometimes unaware that the counterfeit oxycodone pills they are taking contain fentanyl, their lives are put at risk with every use of these dangerous substances. This has resulted in an unprecedented epidemic of overdose deaths in the United States, and an unrelenting increase in overdose deaths in Washington state.

//

United States' Sentencing Memorandum - 8
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

To illustrate, the National Center for Health Statistics, Centers for Disease Control, estimates that, despite a decrease in overdose deaths nationwide, Washington had an increase in overdose deaths of over 27% in the year ending December 2023. *See* Ken Alltucker, *Drug overdoses spiked in these states. But they have dropped elsewhere in the country.*, USA Today, May 15, 2024, available at: https://www.usatoday.com/story/news/health/2024/05/15/drug-overdose-deaths-2023-data/73670888007/ (last accessed November 13, 2025). The scale of the problem is massive. In 2023 and 2024, when Young and their co-conspirators were trafficking narcotics, the annual overdose deaths in the United States rose above 110,000 individuals, as illustrated by the graphic below, published by the CDC's National Center for Health Statistics, entitled, *Provisional Drug Overdose Death Counts*, available at: https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm#notes (last accessed November 13, 2025):



The severity of Young's crimes and the potential impact they have had on the community demonstrate that a five-year mandatory minimum sentence is not justified under the sentencing factors. Rather, a sentence of 168 months (the low end of the guideline range) is sufficient but no greater than necessary to acknowledge the impact his crimes had on the community.

United States' Sentencing Memorandum - 9
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**B.    History and Characteristics of the Defendant**

Young is currently 44 years old. Young has multiple prior convictions for drug trafficking. In 2007, Young was sentenced for two different drug trafficking crimes: (1) a 2004 incident where involving the distribution of Marijuana, and (2) a 2006 incident involving the distribution of marijuana while armed with a 9mm pistol. (PSR ¶¶ 62-63.) While on supervision for those cases, defendant was then arrested and convicted on drug charges for possessing a "large quantity" of ecstasy and a loaded pistol. (PSR ¶ 64.) The Court sentenced defendant to 12 months of home detention, but he absconded from the home detention program for two years leading to his arrest and conviction for Escape in the Second Degree in 2008. (PSR ¶ 65). Shockingly, probation lists this history as a basis for a downward departure rather than an upward departure. (PSR ¶ 131). But it is hard to imagine that a defendant with significant unscored prior convictions for dealing narcotics while armed with firearms should somehow receive a lesser sentence than a defendant with no criminal history. Instead, this history shows that Defendant is less amenable to rehabilitation than other similarly situated defendants. Thus, Defendant's prior history and characteristics demonstrate that he does not warrant a downward departure from a standard guideline sentence.

**C.    Similarly Situated Defendants**

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). But the inquiry is not district specific. Instead, Congress's "primary goal" with section 3553(a)(6) was promoting nationwide consistency in sentencing, *United States v. Jaycox*, 962 F.3d 1066, 1071 (9th Cir. 2020)—that is, to avoid "unjustified difference" across judges or districts, *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007). The Guidelines, which are themselves an anti-disparity formula, are the best tool for achieving that goal. *See Gall v. United*

United States' Sentencing Memorandum - 10
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  *States*, 552 U.S. 38, 49, 54 (2007); *Rita v. United States*, 551 U.S. 338, 354 (2007);
2  *United States v. Osinger*, 753 F.3d 939, 949 (9th Cir. 2014).
3      Young is the first defendant to be sentenced in this case. Thus, it is difficult, for
4  this Court to compare him to the other defendants in this case. To aide the Court in this
5  process, the Government has created a spreadsheet of each defendant, the Government's
6  assessment of their role in the organization, their relative drug culpability, and the
7  anticipated sentencing guideline calculations. *See* Exhibit A – Government Sentencing
8  Chart. The Government maintains that, for Mr. Young, there is not a compelling reason
9  to depart from the standard guideline range. Thus, a sentence of 168 months (the low-end
10 of the guidelines) is sufficient, but no greater than necessary to sentence defendant in line
11 with similarly situated defendants. This is consistent with Probation's original JSIN data
12 (when probation applied a three-level leadership enhancement), which showed that the
13 average sentence was 161 months and the median imprisonment was 168 months.

### III. CONCLUSION

For all the reasons set forth above, the government respectfully recommends the Court impose a custodial sentence of 168 months, to be followed by a four-year term of supervised release, and a $100 special assessment.

DATED November 13, 2025.

Respectfully submitted,

CHARLES NEIL FLOYD
United States Attorney

*/s/ Zachary W. Dillon*
ZACHARY W. DILLON
CRYSTAL C. CORREA
Assistant United States Attorneys
1201 Pacific Ave., Suite 700
Tacoma, Washington 98402
Phone: 253-428-3822
Fax: 253-428-3826
Email: Zachary.Dillon@usdoj.gov

United States' Sentencing Memorandum - 11
*United States v. Young*, CR24-164-JNW-06

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800